UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IFTACH ALONY *and* AMIKAM SADE,

                                    Plaintiffs,

                    -v-

URI CHAITCHIK *and* NOAM TELTCH,

                                    Defendants.

---

24 Civ. 8723 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to dismiss the Amended Complaint of plaintiffs Iftach
Alony and Amikam Sade.  In brief, plaintiffs claim that defendants Uri Chaitchik and Noam
Teltch carried out a scheme to defraud them and other lenders and investors of millions of dollars
intended for the development of an ultra-luxury condominium in Manhattan.  Plaintiffs bring
substantive and conspiracy claims under the Racketeer Influenced and Corrupt Organizations
Act ("RICO"), 18 U.S.C. §§ 1951, *et seq.*, and one common-law claim of aiding and abetting
breach of fiduciary duty.

Defendants move to dismiss the Amended Complaint under Federal Rule of Civil
Procedure 12(b)(6).  For the following reasons, the Court denies the motion.

I.      **Background**[1]

This dispute centers on a project to develop the property located at 540 West 21st Street,
New York, New York 10011 (the "Project").  Dkt. 34 ("AC") ¶ 1.  Upon completion, the Project

---

[1] The Court draws the facts in this decision principally from the Amended Complaint ("AC"),
Dkt. 34. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering
a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may
consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and
documents incorporated by reference in the complaint.").  For purposes of resolving the motion
to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the AC as true,

was to be a 20-story, 275-foot-tall, ultra-luxury mixed-use condominium building, including 34 residential units, among other amenities. *Id.* ¶ 13.

### A.    The Parties

Alony is a citizen of Israel with a residence in Israel. *Id.* ¶ 9.  Sade is a U.S. citizen, with a residence in California. *Id.* ¶ 10.  Both provided financial support for the Project through a series of loans and investments.

Chaitchik is a citizen of Israel with a residence in Israel. *Id.* ¶ 11.  Teltch is believed to be a citizen of Israel and/or the United States, with a residence in Massachusetts. *Id.* ¶ 12.  Both managed and controlled the entities responsible for developing the Project.

### B.    Commencement of the Project

Beginning in 2013, several entities were formed to facilitate the financing for and construction of the Project. *Id.* ¶ 26.  These entities operated from December 2013 through at least March 2024, and were managed and controlled by defendants. *Id.* ¶¶ 22, 25–26, 130.

*Holdings*:  On November 22, 2013, 540 West 21st Street Holdings LLC ("Holdings") was formed. *Id.* ¶ 13.  It was headquartered in New York and incorporated in Delaware. *Id.* The "ostensible and sole purpose" of Holdings LLC was to develop the Project. *Id.*

*540 West LLC*:  On November 27, 2013, 540 West 21st Street LLC ("540 West LLC") was formed. *Id.* ¶ 21(a).  Incorporated in Delaware with its principal place of business in New York, *id.*, it was "established for the purpose of developing, financing, or operating" the Project, *id.* ¶ 130.

*540 West Development*:  On December 12, 2013, 540 West 21st Development LLC ("540 West Development") was formed. *Id.* ¶ 21(b).  Incorporated in Delaware with a principal

---

drawing all reasonable inferences in plaintiffs' favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

place of business in New York, *id.*, it was "established for the purpose of owning Holdings," pursuant to a limited liability company agreement from May 30, 2017, *id.* ¶ 130.

*Casco*:  On December 12, 2013, Casco Development Corporation ("Casco") was formed. *Id.* ¶ 21(c).  Incorporated in Delaware with a principal place of business in New York, *id.*, it was the managing member of both 540 West LLC and 540 West Development (together with Casco, the "affiliated entities"), *id.* ¶ 23.  At all relevant times, both defendants were directors of Casco, and Teltch served as an officer of Casco.  *Id.* ¶ 24.  Chaitchik was also an officer of Casco between December 12, 2013 and at least June 22, 2017.  *Id.*

On or about January 30, 2014, Holdings purchased two lots for the Project.  *Id.* ¶ 15. Holdings purchased additional lots for the Project on April 19, 2015 and June 30, 2017, thereby completing its acquisition of the property located at 540 West 21st Street (the "Property").  *Id.*

These purchases were partially funded by a loan from Bank Hapoalim B.M. ("Bank Hapoalim").  *Id.* ¶ 16.  On December 22, 2014, Holdings obtained a loan from Bank Hapoalim in the original principal amount of $20 million, secured by a mortgage on the Property.  *Id.*  On June 28, 2017, the principal loan balance was increased to $30 million.  *Id.*  On June 6, 2018, it was increased to $50 million.  *Id.*

The Project was also funded by investors and lenders including plaintiffs, as described below.  *Id.* ¶ 17.  Defendants used the following entities to facilitate the financing process:

***Great Feats, Golden Drache, and Salamander***:  On January 27, 2015, Great Feats Ltd. ("Great Feats"), a British Virgin Islands company, was formed and registered for the "sole purpose of investing funds in the Project" through 540 West LLC and Holdings.  *Id.* ¶ 29.

3

Salamander Associates Ltd. ("Salamander") was the director of Great Feats.[2] *Id.* ¶ 186. Golden Drache Ltd. ("Golden Drache") was the manager of Great Feats. *Id.* ¶ 30. Teltch was the sole individual director of Golden Drache. *Id.*

Great Feats' counsel and escrow agent was Doron Levy of Amit, Pollak, Matalon & Co. ("APM Law"), a law practice with an office in Tel Aviv, Israel. *Id.* ¶ 31. Levy was responsible for collecting and holding Great Feats funds in escrow, managing the escrow account, and communicating with Great Feat investors on behalf of Golden Drache. *Id.* Levy carried out these functions pursuant to instructions from Teltch, who directed the disposition of funds in the Great Feats escrow account and communications with Great Feats investors. *Id.*

*Ambarfeld*: Great Feats acquired a portion of Ambarfeld Ltd. ("Ambarfeld"), a British Virgin Islands company, which held shares in 540 West LLC directly and Holdings indirectly. *Id.* ¶ 33. Ambarfeld was managed by Golden Drache and controlled by Teltch, who was also its proxy. *Id.*

*Icy Face*: Icy Face Ltd. ("Icy Face") is another British Virgin Islands company that defendants used to raise money for the Project. *Id.* ¶ 36.

### C.    Plaintiffs' Contributions to the Project

In 2015, defendants began soliciting lenders and investors for the Project. *Id.* ¶ 28. These included Alony and Sade.

#### 1.    Alony

In 2015, Chaitchik met twice with Alony in Tel Aviv to discuss financing the Project. *Id.* ¶ 28. On April 15, 2015, Chaitchik prepared an investment brief (the "investment brief") for

---

[2] The AC variably refers to Salamander Associates Ltd. and Salamander Management Ltd. Because the AC does not distinguish between these two entities, the Court assumes that they are the same and refers to them as "Salamander."

Holdings to promote the Project. *Id.* ¶¶ 28, 36. On April 23, 2025, Chen Shein, another prospective investor, sent the investment brief to Alony at Chaitchik's request. *Id.* ¶ 28. In those meetings and in the investment brief, Chaitchik represented that the Project was estimated to cost $250 million; that investors would invest in the Project by buying up to 25% interest in Holdings through Great Feats; and that all funds raised through Great Feats would go to the Project. *Id.* ¶ 28. Before Alony made his initial contribution, APM Law, acting on instructions from Teltch, sent Alony the Great Feats loan documents (the "loan documents"), which stated, in sum, that:

> (a) Great Feats was a single purpose entity established for the sole purpose of investing funds in the Project through 540 West LLC directly and Holdings indirectly; and (b) the loan amounts would be held by the escrow agent, Levy, for the benefit of the lenders and any disposition of the loan amounts directed by the manager would be beneficial for all parties to the transaction, including the lenders and Great Feats[.]

*Id.* ¶ 34.

In December 2015, Alony made a $999,000 loan to, and a $10,000 equity investment in, Great Feats, repayable at an annual interest rate of 18%, compounded annually. *Id.* ¶ 35. Between December 23, 2015 and September 13, 2016, Alony paid the loan and investment in installments by transferring funds from his bank account in Israel to Morgan Stanley and Citibank accounts in New York (respectively, the "MS Account" and "Citibank Account"; collectively, the "NY Accounts"). *Id.* Alony made these payments out to Great Feats, as directed by APM Law. *Id.*

In September 2016, Alony loaned $365,000 to Great Feats and Icy Face, repayable at an annual interest rate of 12%, compounded annually. *Id.* ¶ 37. Pursuant to that agreement, Alony also would receive equity in the form of participation payments from the profits of Great Feats and Icy Face. *Id.* On September 13 and 15, 2016, Alony transferred the funds in installments

from his bank account in Israel to the Citibank Account. *Id.* Alony again made these payments out to Great Feats, as directed by APM Law. *Id.*

In February 2019, Alony agreed to loan $250,000 to 540 West Development, repayable at an interest rate of 15%, compounded monthly. *Id.* ¶ 60. On February 5, 6, and 7, 2019, Alony transferred the funds in installments from his bank account in Israel to Holding's Bank Hapoalim account in New York. *Id.* In connection with the loan agreement, Teltch signed a promissory note on behalf of 540 West Development. *Id.*

### 2. Sade

On or about August 2, 2016, Shein, acting at Chaitchik's direction, solicited Sade to invest in the Project. *Id.* ¶ 36. He did so by sending Sade information in the investment brief, including that "the funds being raised via Great Feats are for the purpose of financing the development of the Property," and "Sade's loan will be used in the Project and repayment on the loan will come solely from proceeds of the Project and before any return to shareholders." *Id.*

In September 2016, Sade loaned $600,000 to Great Feats and Icy Face, repayable at an annual interest rate of 12%, compounded annually. *Id.* Pursuant to that agreement, Sade also would receive equity in the form of participation payments from the profits of Great Feats and Icy Face. *Id.* On September 6, 2016, Sade transferred the funds from his bank account in California to the Citibank Account, as directed by APM Law. *Id.*

### D. Misrepresentations and Misappropriation of Project Funds

The AC alleges that defendants made a series of misrepresentations to banks, lenders, and investors, including plaintiffs, and misappropriated the funds that they raised from those individuals and entities.

6

### 1.    Misrepresentations to Banks, Lenders, and Investors

The alleged misrepresentations fall into three categories: those made (1) to Morgan Stanley, where defendants maintained a bank account; (2) to lenders and investors; and (3) in the Holdings bankruptcy proceedings (the "Bankruptcy Proceedings"). The Court summarizes the first two categories of misrepresentations here and describes those related to the Bankruptcy Proceedings below.

First, the AC alleges that defendants lied to Morgan Stanley about their identities and ownership of the funds in the MS Account. In 2015, when Teltch registered as an authorized signatory on the MS Account, he falsely stated that he was a Panamanian resident. *Id.* ¶ 49. And on August 17, 2020, when Teltch wrote a letter to Morgan Stanley requesting the transfer of $125,724 from the MS Account to a bank account in Chaitchik's name, Teltch falsely represented that the remaining balance of the MS Account was a loan from Golden Drache to Chaitchik and attached a promissory note that falsely stated that Chaitchik was a Brazilian passport holder. *Id.*

Second, the AC alleges that defendants made false statements to lenders and investors. In 2015 and 2016, defendants prepared and/or transmitted the investment brief and loan documents, which misrepresented that all the funds raised would go to the Project via Great Feats and be held by Great Feats' escrow agent. *See id.* ¶¶ 28, 34. On or about June 28, 2017, in connection with the Bank Hapoalim loan, defendants submitted a structure chart of Holdings to Bank Hapoalim that falsely identified Great Feats and Alony as ultimate beneficiaries of the Project. *Id.* ¶ 57(a). And on or about August 31, 2017, July 2, 2019, December 31, 2020, and in or about 2021, APM Law transmitted to plaintiffs the Great Feats financial statements, which reflected that approximately $22 million of the financing from Great Feats went into Holdings and its

7

affiliated entities for the Project, even though such funds were actually diverted to other beneficiaries. *Id.* ¶ 57(b).

### 2.    Misappropriation of Funds

The AC alleges that defendants raised approximately $22 million in funding for the Project through Great Feats, but that—apart from a $2.1 million payment to an account in Switzerland in the name of Great Feats—these funds never went to Great Feats or its escrow agent. *Id.* ¶¶ 38–42.  Instead, the funds were deposited in the NY Accounts, neither of which were held by Great Feats—the MS Account was held by Golden Drache and controlled by Teltch, and the Citibank Account was held by Ran Ben Daniel, a New York attorney. *Id.* ¶ 40. From there, the funds were transferred to beneficiaries other than Great Feats, APM Law, Icy Face, Ambarfeld, Holdings, or its affiliated entities. *Id.* ¶ 42.

The AC alleges numerous transfers from the MS Account to individuals and entities in Geneva, Switzerland.  On or about August 12, 2015, Teltch instructed Vincent Deguingand and/or Leonard O'Brien of Salamander to transfer $750,000 to "Ilan Eran Tzvi" or "Carmel Tal." *Id.* ¶ 44.  On or about October 8, 2015, Teltch instructed the same to transfer $10,000 to "Pictet & cie." *Id.*   On or about October 12, 2015, Teltch instructed the same to transfer $3 million to Starkwall Ventures Ltd. *Id.*  On or about January 14, 2016, Teltch instructed Morgan Stanley, Deguingand and/or O'Brien to transfer another $3 million to Starkwall Ventures Ltd. *Id.*  And on or about August 10, 2016, Teltch made a verbal wire request to Morgan Stanley to transfer $13,200 to Salamander. *Id.*   The AC also alleges transfers from the Citibank Account to entities in Liechtenstein.  On March 10, 2016, transfers of $21,294.08 and $21,910.82 were made to Salamander in Liechtenstein at the direction of Teltch. *Id.* ¶ 45.

In addition, the AC alleges that defendants misappropriated funds for personal purposes. *Id.* ¶ 46.  On or about March 10, 2016, Chaitchik formed and registered Ibizawill Sociedad

Limitada, a Spanish company, for the purpose of constructing his personal residence in Ibiza, Spain, using the funds ostensibly raised for the Project. *Id.* ¶ 51. On December 1, 2017, Chaitchik paid to rent a ski chalet in Verbier, Switzerland by wiring €15,040.89 from Holdings' Chase Bank account in New York. *Id.* ¶ 47. On or about January 22, 2018, Teltch instructed Deguingand and/or O'Brien to transfer $500,000 from the MS Account to an account in Chaitchik's name. *Id.* ¶ 48. On or about January 23, 2018, Morgan Stanley completed this request. *Id.* ¶ 50. On August 17, 2020, Teltch authorized the transfer of the remaining balance in the MS Account—$125,724—to an account in Chaitchik's name. *Id.* ¶ 49. On or about August 19, 2020, Morgan Stanley completed this request. *Id.* ¶ 50.

As a result of the diversion of these funds, defendants were forced to raise more funds for the Project. In December 2019, defendants estimated that the Project would cost a total of $409 million—a marked increase from the $250 million that they originally projected. *Id.* ¶ 53.

### E.    Default on Bank Hapoalim Loan

On August 31, 2020, Bank Hapoalim extended its loan to Holdings, pursuant to an agreement signed by Teltch on behalf of Holdings and joined by Chaitchik as a guarantor on the loan. *Id.* ¶ 61. On February 28, 2021, Holdings defaulted on the loan. *Id.* ¶ 62.

On March 29, 2022, Chaitchik's father-in-law, Abraham "Rami" Unger, formed Ray New York ("Ray NY") for the purpose of taking over Holdings' loan. *Id.* ¶ 63. On April 7, 2022, Ray NY purchased the loan from Bank Hapoalim for $52 million ($50 million in principal and $2 million in interest) and advanced another $4 million on the loan to Holdings. *Id.* ¶ 64. Ray NY charged "excessive interest" on the loan at an effective annual rate of approximately 27.6%. *Id.* ¶ 65. The AC estimates that, as of April 29, 2024—two years after Ray NY's purchase of the loan—Holdings owed Ray NY more than $90 million, including approximately $34 million in interest and fees. *Id.*

### F.     Bankruptcy Proceedings

On August 2, 2023, Holdings filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware. *Id.* ¶ 20. At that time, Holdings had $50,000 remaining, *id.*, and only the foundation of the Project had been built, *id.* ¶ 55.[3]

The AC alleges that defendants, or persons acting at their direction, made numerous misrepresentations during the Bankruptcy Proceedings.

First, defendants misrepresented the relationship between Holdings and Ray NY. On August 1, 2023, Teltch signed the voluntary bankruptcy petition, which stated that Ray NY is not an insider or related party, that no other persons were liable on Ray NY's claim, and that Holdings had no co-debtors. *Id.* ¶ 68. In fact, Chaitchik's father-in-law was the founder of Ray NY and defendants were guarantors of the Ray NY loan. *Id.* On August 2, 2023, a motion was filed in the Bankruptcy Proceedings that sought super-priority status and expansive releases for Ray NY. *Id.* ¶ 67. On September 8, 2023, after a creditor identified the relationship between Holdings and Ray NY, Holdings disclosed the relationship to the Bankruptcy Court. *Id.* Because of these misrepresentations, the loan between Holdings and Ray NY was not treated as an insider loan, and therefore not subject to additional scrutiny. *Id.* ¶ 71. As a result, Ray NY received a $64.5 million payment from the sale of the Property, defendants received releases from their personal guarantees of the Ray NY loan, and many creditors got nothing. *Id.* ¶¶ 71–72.[4]

---

[3] In total, defendants raised $282 million for the Project. AC ¶ 156. Plaintiffs allege that $207 million of the Project's funds was spent on acquisition, demolition, and abatement, *id.* ¶ 55, and that the other $75 million did not go to the Project and has not been accounted for, *id.* ¶ 156.

[4] The AC provides a list of lenders and investors who are alleged to have suffered complete or substantial losses. *See* AC ¶ 81.

Second, defendants misrepresented the extent of their control over Holdings and its affiliated entities. On March 3, 2024, Holdings filed a bankruptcy plan, which stated that Chaitchik held less than 10% of the membership interests in Casco and that "decision-making authority at all levels . . . is vested in the two remaining members of Casco, with the unanimous consent of both remaining owners required to take any corporate action." *Id.* ¶ 69. Holdings did not disclose that these two individuals were Chaitchik and Teltch. *Id.* In that filing and others, Holdings also did not disclose that defendants raised financing for the Project through Great Feats, which Teltch controlled. *Id.* ¶ 80. Holdings represented that Great Feats was a third-party investor, concealing that Chaitchik solicited investors and lenders for the Project via Great Feats. *Id.* ¶ 82.

Third, defendants instructed Holdings' bankruptcy attorneys and chief restructuring officer, Tomer Jacob, to make false statements in the Bankruptcy Proceedings. *Id.* ¶ 108. These related to the extent of Chaitchik's control over Casco, the involvement of Chaitchik in negotiating the Ray NY loan, and the relationship between defendants and Great Feats. *Id.*

Fourth, defendants omitted, or provided incorrect information for, certain investors and lenders in the Bankruptcy Proceedings, to prevent those creditors from making claims or recovering. *Id.* ¶ 73. In the August 1, 2023 voluntary bankruptcy petition, Teltch omitted approximately 50 investors and lenders in the Project. *Id.* ¶ 74. He also omitted a pending lawsuit filed by IRHA Investment Ltd. ("IRHA") against 540 West LLC and 540 West Development related to a purchase right that IRHA exercised under its agreements with them. *Id.* ¶ 79.

After a creditor pointed out the omissions of various creditors, Teltch signed amended schedules. *Id.* ¶ 74. On October 6, 2023, Teltch again omitted Sade from the list of creditors in

11

the amended bankruptcy schedules, and incorrectly identified the addresses of other creditors, including Alony. *Id.* ¶ 75. The schedule identified Alony's address as "care of Doron Levy," when in fact Levy was not an agent or point of contact for Alony. *Id.*

As a result of these incorrect or incomplete statements, Alony and Sade did not receive notices about their right to file a proof of claim or object to Holdings' proposed bankruptcy plan. *Id.* ¶ 76.[5] Instead, such notices went to Levy, who did not relay them to plaintiffs. *Id.* ¶ 77. On October 17, 2023, Levy sent plaintiffs and other creditors a letter, which:

> (a) stated that Holdings filed for bankruptcy and Great Feats will not be entitled to any payment under the plan; (b) stated that Levy could not advise on United States' law, but it appears that "there is zero chance of opposing the proposed debt settlement" in the bankruptcy plan (despite Levy being served with notices and motions that provided Plaintiffs and other creditors with such opposition rights); and (c) requested that the creditors provide Levy with a power of attorney that would enable Levy to liquidate Great Feats.

*Id.* ¶ 198.

Ultimately, Alony filed a late claim in the Bankruptcy Proceedings and Sade did not file a claim. *Id.* ¶ 78. Creditors who filed timely claims received a substantially higher percentage of recovery on their loans to the Project than creditors who filed late claims. *Id.*

### G.    Procedural History

On November 16, 2024, plaintiffs filed an initial complaint. Dkt. 1. On March 14, 2025, defendants moved to dismiss the complaint. Dkt. 27. On April 14, 2025, plaintiffs filed the AC, the operative complaint. Dkt. 34. On May 5, 2025, defendants moved to dismiss. Dkt. 36 ("MTD"). On May 19, 2025, plaintiffs opposed the motion. Dkt. 39. On May 20, 2025, plaintiffs filed an amended memorandum of law in opposition to the motion. Dkt. 41 ("Opp'n").

---

[5] The AC also alleges that, near the end of 2023 and before the bankruptcy plan's confirmation, Chaitchik offered to buy the claims of numerous investors and lenders for $10 so that defendants could realize a tax write-off on their losses from the Project, but failed to inform those investors and lenders that they could file claims in the Bankruptcy Proceedings. AC ¶ 83.

On May 27, 2025, defendants replied. Dkt. 42 ("Reply"). On May 28, 2025, the parties requested oral argument on the motion. Dkts. 43, 44.

## II.    Applicable Law

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

For claims alleging fraud, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard. Such claims must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a complaint must "allege facts that give rise to a strong inference of fraudulent intent." *Berman v. Morgan Keegan & Co.*, 455 F. App'x 92, 95 (2d Cir. 2012) (summary order) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). Specifically, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292–93 (2d Cir. 2006) (citation omitted).

### III.    Discussion

Defendants move to dismiss all claims under Rule 12(b)(6).  For the following reasons, the Court denies this motion.

#### A.    Civil RICO Claims

Section 1962(c) of Title 18 makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  To establish a violation of Section 1962(c), *i.e.*, a substantive violation of the RICO statute, a civil plaintiff must show that he or she was injured by "defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (quoting *Azrielli v. Cohen Law Offs.*, 21 F.3d 512, 520 (2d Cir. 1994)).  As to the fourth element, "Section 1961(1) sets forth an exhaustive list of predicate 'acts' that can constitute a pattern of 'racketeering activity.'"  *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018).

Section 1962(d) of Title 18, as relevant here, makes it a crime to conspire to violate Section 1962(c).  To establish a violation of Section 1962(d), *i.e.*, a RICO conspiracy, a civil plaintiff must demonstrate that the alleged coconspirators "knew about and agreed to facilitate" the racketeering activity.  *Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003) (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)).

Defendants argue that the AC's substantive RICO claims are deficient because the AC fails to adequately allege (1) the existence of an association-in-fact enterprise, (2) any predicate acts of racketeering activity, (3) a pattern of racketeering activity, or (4) that the predicate acts

14

were the proximate cause of plaintiffs' alleged injuries.  Defendants argue that because the AC's substantive RICO claims are defective, its RICO conspiracy claims likewise fail.

The Court first considers whether the AC adequately alleges the contested elements of a substantive RICO claim.  It then considers whether the AC states a RICO conspiracy claim.

### 1.    RICO Enterprise

A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  Accordingly, "[a] RICO enterprise may be a lawful entity or an association-in-fact." *Black v. Ganieva*, 619 F. Supp. 3d 309, 330 (S.D.N.Y. 2022).  Salient here, "[a]n association-in-fact enterprise is a group of persons associated together for a common purpose of engaging in a course of conduct, and has three basic features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit [the] associates to pursue the enterprise's purpose." *United States v. Kelly*, 128 F.4th 387, 408 (2d Cir. 2025) (citation omitted).  The common purpose need not be "fraudulent or illegal." *Id.* at 411.  "[I]n accordance with the law's purposes, the RICO statute is to be 'liberally construed,' giving a broad and flexible reach to the term 'association-in-fact.'" *D'Addario v. D'Addario*, 901 F.3d 80, 100 (2d Cir. 2018) (quoting *Boyle v. United States*, 556 U.S. 938, 944 (2009)).

The AC allege that defendants conducted the affairs of two RICO enterprises—Holdings, and an association-in-fact consisting of Holdings, 540 West LLC, 540 West Development, and Casco.  Defendants do not dispute that Holdings qualifies as a lawful entity under RICO.  Accordingly, as to the first and third causes of action, which identify Holdings as the enterprise, defendants concede that the enterprise requirement is satisfied.  But, they argue, the AC does not

adequately allege the association-in-fact, comprised of Holdings and its affiliates, on which the second and fourth causes of action rely.

The AC plausibly alleges such an association-in-fact. To begin, it alleges that the component entities had two common purposes—developing the Project and defrauding lenders and investors. The AC alleges that each entity facilitated fundraising for the Project. *See* AC ¶¶ 131, 133. It alleges that 540 West Development raised the funds in connection with Alony's third loan to the Project, *id.* ¶ 133; that Casco was the overall manager of fundraising for the Project, *id.* ¶ 131; and that Holdings and its affiliates knew that at least $20 million of the money raised through Great Feats was not going to the Project, yet prepared reports stating otherwise, *id.* ¶ 133. To be sure, as defendants note, the AC's allegations have limited detail, including regarding the timing and substance of the reports that some entities prepared and the distinct responsibilities each had in the fundraising scheme. But, as to the enterprise element, a "complaint need satisfy only the 'short and plain statement' standard of [Federal Rule of Civil Procedure] 8(a)." *D. Penguin Bros. v. City Nat'l Bank*, 587 F. App'x 663, 666 (2d Cir. 2014) (summary order). The AC's allegations as to a common purpose clear that bar.

Second, the AC adequately alleges the relationships between the affiliated entities. "[C]ourts in this Circuit analyze the 'hierarchy, organization, and activities' of the alleged association to determine whether 'its members functioned as a unit.'" *Cont'l Petrol. Corp. v. Corp. Funding Partners, LLC*, No. 11 Civ. 7801 (PAE), 2012 WL 1231775, at *5 (S.D.N.Y. Apr. 12, 2012) (quoting *First Cap. Asset Mgmt. v. Satinwood, Inc.,* 385 F.3d 159, 174–75 (2d Cir. 2004)). A "conclusory naming of a string of entities" does not suffice. *Id.* Here, however, the AC alleges the position of each entity. It alleges that Casco was the managing member of 540 West LLC and 540 West Development, AC ¶ 23; and that 540 West LLC owned 540 West

16

Development, which in turn owned Holdings, *id.* ¶ 130. As a result, it alleges, Casco "managed 540 West LLC (directly), [540 West] Development (directly), and Holdings (indirectly through 540 West LLC and Development)." *Id.* ¶ 131. And because the defendants managed and controlled Casco and both served as directors and officers of it at various points, *id.* ¶ 24, defendants also "held management and control of Holdings, 540 West LLC, and [540 West] Development," *id.* ¶ 25. The AC cites communications and agreements indicating that defendants held themselves out as having such authority. *Id.* Based on the organization's structure and its shared control by defendants, the AC adequately alleges "that [the association's] 'members functioned as a unit.'" *Satinwood*, 385 F.3d at 174–75 (quoting *Nasik Breeding & Rsch. Farm Ltd. v. Merck & Co.,* 165 F. Supp. 2d 514, 539 (S.D.N.Y. 2001)).

Third, the AC alleges that the association-in-fact operated for long enough to permit it to pursue its common purpose. In assessing longevity, the relevant period is the length of time that the association-in-fact operated, not the length of time throughout which it is alleged to have engaged in racketeering activity. *See Kelly*, 128 F.4th at 410 (emphasizing distinction "between the RICO enterprise on the one hand (which need not be inherently criminal) and the pattern of racketeering activity on the other (which necessarily is the course of criminal activity by the enterprise)"). Here, the AC alleges that the affiliated entities were established in 2013, fraudulently induced investments and loans from creditors from 2015 until at least 2019, and made false statements throughout the Bankruptcy Proceedings, which ended in 2024. AC ¶ 26. The Court puts aside the period after 2019 because the AC does not allege that the affiliated entities conducted operations during that time (for example, it does not allege that the affiliated entities played any role in the Bankruptcy Proceedings). The well-pled period of the association-in-fact's operation is thus six years—from 2013, when Holdings and the affiliated entities were

17

formed, *id.* ¶¶ 13, 21, to 2019, the last year in which the entities are alleged to have sought financing for the Project and prepared a false report for transmittal to lenders and investors, *id.* ¶¶ 59–60, 133. That duration satisfies the longevity requirement. *See, e.g., Equinox Gallery Ltd. v. Dorfman*, 306 F. Supp. 3d 560, 573 (S.D.N.Y. 2018) (longevity satisfied where enterprise allegedly operated for more than six years); *Allstate Ins. Co. v. Etienne*, No. 9 Civ. 3582, 2010 WL 4338333, at *6 (E.D.N.Y. Oct. 26, 2010) (more than three years); *Automated Teller Mach. Advantage LLC v. Moore*, No. 8 Civ. 3340, 2009 WL 2431513, at *7 (S.D.N.Y. Aug. 6, 2009) (more than two years).

Defendants' arguments to the contrary are unavailing. They contend that the AC does not plead facts implicating 540 West Development or 540 West LLC in the fraudulent scheme. MTD at 13. In fact, the AC alleges that both entities knew of the ongoing misappropriation of funds yet continued to fundraise from investors and lenders and prepare reports falsely stating that previous investments and loans went to the Project. AC ¶ 133. Defendants also argue that the AC does not plead that the association-in-fact enterprise existed beyond the underlying pattern of racketeering activity, as required. MTD at 13. But the AC alleges that Holdings and the affiliated entities raised funds that were used for legitimate purposes related to the Project, as evidenced by the completion of the demolition and foundation construction for the Project. *See, e.g.,* AC ¶¶ 55, 115, 131. Holdings and the affiliated entities thus are plausibly alleged to have had a purpose beyond carrying out the predicate acts. Defendants will be at liberty to bring a similar challenge on summary judgment, but the AC's allegations suffice to clear the "low threshold" for pleading an association-in-fact. *Etienne*, 2010 WL 4338333, at *6 (citation omitted); *see also Breslin Realty Dev. Corp. v. Schackner*, 397 F. Supp. 2d 390, 403 (E.D.N.Y.

18

2005) ("[T]he liberal pleading requirements . . . constrain the court to hold that enterprise is alleged sufficiently to survive this motion to dismiss.").

The AC thus has adequately alleged the "three basic features" of an association-in-fact. *Kelly*, 128 F.4th at 408; *see, e.g.*, *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 314 (S.D.N.Y. 2009) (association-in-fact adequately pled where complaint alleged a "clear structure," and common purpose "of defrauding [plaintiff]"); *Moore*, 2009 WL 2431513, at *6–7 (same where complaint alleged "common purpose to defraud [p]laintiff," and "detail[ed] the relationships among the members"); *Edmondson v. Raniere*, 751 F. Supp. 3d 136, 159 (E.D.N.Y. 2024) (same where complaint "identifie[d] the roles that each [individual] served" and alleged "a number of common purposes"); *Madanes v. Madanes*, 981 F. Supp. 241, 252 (S.D.N.Y. 1997) (same where "structure of this enterprise is clear from the pleadings").

### 2.    Predicate Acts

"To be liable under the RICO statute, a defendant must commit 'at least two acts of racketeering activity,' 'the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity.'" *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d. 392, 405 (S.D.N.Y. 2013) (quoting 18 U.S.C. § 1961(5)).  The AC alleges numerous predicate acts: the receipt or transportation of goods taken by fraud, bank fraud, mail fraud, wire fraud, bankruptcy fraud, and witness tampering.  As explained below, the Court finds at least two predicate acts (and therefore this element) plausibly pled, and thus does not consider whether the remaining acts qualify.

### a.    National Stolen Property Act

The National Stolen Property Act, 18 U.S.C. §§ 2314, 2315 ("NSPA") makes it a crime to transport or receive "any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud."  At the

motion to dismiss stage, a complaint therefore must plausibly allege that: "(1) the defendant[s] transported [or received] property, as defined by the statute, in interstate commerce, (2) the property was worth $5,000 or more, and (3) the defendant[s] knew the property was 'stolen, converted or taken by fraud.'" *United States v. Wallach*, 935 F.2d 445, 466 (2d Cir. 1991) (quoting *Dowling v. United States*, 473 U.S. 207, 214 (1985)). Per Rule 9(b), violations of the NSPA must be pled with particularity. *See Bd. of Managers of Trump Tower at City Ctr. Condo. v. Palazzolo*, 346 F. Supp. 3d 432, 456 (S.D.N.Y. 2018).

The AC plausibly alleges each element of an NSPA claim.

First, it alleges numerous transfers of funds from the NY Accounts to foreign individuals and entities, including the dates of such transfers, the names of the recipients, and the amounts of money transferred. *See* AC ¶¶ 44–45.

Second, it alleges that the transfers were for amounts far greater than $5,000. *Id.* (alleging transfers of amounts including $750,000, $21,294.08, and $3 million).

Third, it alleges that defendants knew the transferred funds had been fraudulently obtained. To plead fraud with the requisite particularity, the "complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir. 1989). The AC satisfies these requirements. It alleges that on April 23, 2015 and August 2, 2016, Shein, acting at Chaitchik's direction, sent Alony and Sade an investment brief, which falsely stated that all funds raised through Great Feats would be used in the Project. AC ¶¶ 28, 36. It alleges that, around roughly the same time, APM Law, acting at Teltch's direction, transmitted to Alony and Sade the loan documents, which falsely represented that Great Feats'

"sole purpose" was to "invest[] funds in the Project," and that "the loan amounts would be held by the escrow agent" for Great Feats. *Id.* ¶ 34. And it alleges that on or about August 31, 2017, July 2, 2019, December 31, 2020, and in or about 2021, APM Law transmitted financial statements to plaintiffs and other investors which falsely stated that Great Feats had invested the loans in Holdings and its affiliated entities. *Id.* ¶ 57(b). The AC also alleges the aspects of these statements that were false or misleading. It alleges that the NY Accounts—to which plaintiffs were directed to transfer their funds—were not held by Great Feats or its escrow agent, but rather by Golden Drache and Ran Ben Daniel. *Id.* ¶ 40. It alleges that the contributions of creditors were not disposed of in a manner beneficial for all parties, but instead were transferred by defendants to entities not affiliated with the Project. *Id.* ¶ 42. And it alleges that only $2.1 million was paid out of the NY Accounts to an account in the name of Great Feats. *Id.* Accordingly, the AC alleges with the requisite particularity that plaintiffs' funds were obtained by fraud. *See, e.g., Wallach*, 935 F.2d at 466–67 (allegations supported property was obtained by fraud where defendants had "concealed essential facts," "which if disclosed might have led to the relevant payments being recouped and any similar future payments being halted"); *Welch Foods Inc. v. Gilchrist*, No. 93 Civ. 641, 1996 WL 607059, at *4 (W.D.N.Y. Oct. 18, 1996) (same where defendant transmitted fraudulent mailings and invoices containing false or inflated charges).

Defendants' arguments to the contrary are unpersuasive. First, they argue that the AC does not allege an NSPA violation with the requisite particularity because the funds in the NY Accounts were not "stolen" or "unlawfully converted," but rather wired into those accounts by plaintiffs themselves. MTD at 14. But, as plaintiffs note, the AC alleges that they wired the funds in reliance on defendants' fraudulent misrepresentations. AC ¶¶ 35–37. Thus, the funds

are plausibly alleged to have been "taken by fraud." 18 U.S.C. §§ 2314, 2315.[6]  Second,

defendants argue that the AC does not plead facts supporting that the alleged transfers "were in

any way improper." MTD at 14.  But the NSPA requires only that the wrongfully obtained

property have been transferred or received, not that the transfers were intrinsically improper.  *See*

18 U.S.C. §§ 2314, 2315.  Third, defendants argue that the AC does not plausibly allege that any

transferred funds belonged to plaintiffs.  But "[o]n a motion to dismiss, a court must read the

complaint generously, and draw all inferences in favor of the pleader." *Cosmas*, 886 F.2d at 11.

The AC plausibly alleges that plaintiffs transferred funds into the NY Accounts, and that $20

million of the $22 million of the funds in those accounts was then transferred to individuals and

entities other than Great Feats, Holdings, or the affiliated entities.  AC ¶ 42.  Drawing all

inferences in favor of the AC, the AC alleges that defendants obtained plaintiffs' contributions

by fraud and executed transfers in violation of the NSPA.

The AC thus plausibly alleges each element of an NSPA violation.  *See, e.g., Kriss v.*

*Bayrock Grp. LLC*, No. 10 Civ. 3959, 2016 WL 7046816, at *14 (S.D.N.Y. Dec. 2, 2016)

(predicate act plausibly pled where complaint specifically alleged each element of NSPA), *on*

*reconsideration in part*, No. 10 Civ. 3959, 2017 WL 1901966 (S.D.N.Y. May 8, 2017); *In re*

---

[6] Relatedly, defendants argue that the property could not have been stolen or converted because they had lawful authority over the funds in the NY Accounts and Holdings' Chase Bank account. MTD at 14–15.  They liken this case to one in which defendants were alleged to have stolen jewelry by removing it from a warehouse, in violation of the NSPA. *Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, No. 12 Civ. 8205, 2013 WL 3943267, at *6 (S.D.N.Y. July 31, 2013). That court found that because defendants were given "express [contractual] authority to effect such removal," the allegations "raise[d] a contract dispute regarding the extent of the authority and autonomy granted to [d]efendants," rather than an NSPA violation. *Id.*  In that case, however, a contract governed the transaction and there was no allegation that defendants obtained the property by fraud.  As a result, those allegations centered on the extent of defendants' lawful control over property.  Here, the allegations center on defendants' use of fraud to gain such control.

*Firestar Diamond, Inc.*, 634 B.R. 265, 290–91 (Bankr. S.D.N.Y. 2021) (same); *Env't Servs., Inc. v. Recycle Green Servs., Inc.*, 7 F. Supp. 3d 260, 272 (E.D.N.Y. 2014) (same).

### b.    Mail and Wire Fraud

"The federal mail and wire fraud statutes penalize using the mails or a wire communication to execute 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quoting 18 U.S.C. §§ 1341, 1343). The "essential elements of mail and wire fraud are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (cleaned up). Because the statutes use "the same relevant language," courts "analyze them the same way." *United States v. Schwartz*, 924 F.2d 410, 416 (2d Cir. 1991). A complaint alleging mail and wire fraud must satisfy the particularity requirements of Rule 9(b). *See Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013).

The AC adequately pleads each required element.

It alleges schemes to defraud aimed at "get[ting] money or property." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000). "A 'scheme to defraud' is 'a plan to deprive a person of something of value by trick, deceit, chicane or overreaching.'" *Williams*, 889 F.3d at 124 (quoting *Autuori*, 212 F.3d at 115). The AC alleges that defendants schemed to: (1) fraudulently raise millions from plaintiffs and other lenders, (2) transfer money intended for the Project to Chaitchik for personal use, and (3) earn Chaitchik's father-in-law millions of dollars of profit through the Bankruptcy Proceedings. Opp'n at 17. Two of these, as pled, fit the definition of a

23

scheme to defraud.[7]  The financing scheme entailed taking millions from investors and lenders by mispresenting that their contributions would go to the Project.  And the Bankruptcy Proceedings scheme involved withholding information, or providing false information, about the relationship between Holdings and Ray NY, the extent of defendants' control over Holdings and the affiliated entities, and the full list of creditors, to deprive creditors of the proceeds from the sale of the Property.

The AC also alleges use of mails or wires to further those schemes.  As required by Rule 9(b), it "state[s] the contents of the communications, who was involved, and where and when they took place, and . . . why they were fraudulent."  *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993)).  It alleges transmissions on specific and approximate dates containing false representations that the funds raised through Greats Feats would be held by its escrow agent and go to the Project, and that Great Feats had invested the loans in Holdings and its affiliated entities.  *See supra* pp. 20–21.  It also alleges that defendants transmitted documents containing false statements in connection with the Bankruptcy Proceedings.  It alleges that, on August 1, 2023, Teltch filed the voluntary petition, which falsely stated that Ray NY was not an insider or related party and that defendants did not control Holdings.  *Id.* ¶ 68.  It alleges that that filing omitted approximately 50 investors and lenders from the list of creditors.  *Id.* ¶ 74.  It alleges that, on October 6, 2023, Teltch transmitted an amended schedule, which omitted Sade from the list of creditors for a second time and incorrectly identified Alony's address as "care of

---

[7] The scheme to transfer money to Chaitchik presents a closer question, as the AC does not clearly plead how that transfer interfered with the property rights of plaintiffs or of Morgan Stanley.  *See United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) ("A scheme to deceive . . . is not a scheme to defraud in the absence of a property right for the scheme to interfere with.").

Doron Levy"—the Great Feats escrow agent. *Id.* ¶ 75. And it alleges that, on October 17, 2024, Levy, acting on instructions from Teltch, transmitted a letter to plaintiffs falsely stating that Great Feats would not be entitled to any payment under the bankruptcy plan and that plaintiffs had "zero chance of opposing the proposed debt settlement." *Id.* ¶¶ 77, 198. [8] As alleged, these communications furthered the fraud schemes, as they aimed to induce plaintiffs to loan money to the Project and the Bankruptcy Court to prioritize repayment of Ray NY's loan at the expense of other creditors. *See, e.g., In re Stephens*, No. 21-42857, 2023 WL 2636396, at *15 (Bankr. E.D.N.Y. Mar. 23, 2023) (misrepresentations found to be in furtherance of scheme to defraud where they were made to "induce [plaintiff] to transfer" her property to defendants).

Defendants' arguments to the contrary are unavailing. They argue that plaintiffs should have realized that the NY Accounts did not belong to Great Feats. MTD at 19. But the pertinent point is whether defendants made false statements to the effect that plaintiffs' contributions would be held by Great Feats and go entirely to the Project, and the AC plausibly so pleads. Defendants also note that many false statements in the Bankruptcy Proceedings were later exposed and corrected. MTD at 20. But that does not undermine the pleading that the false statements, when made, were part of an intended fraud.

The AC thus plausibly pleads the elements of mail and wire fraud. *See, e.g., 4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 538 (S.D.N.Y. 2014) (complaint stated wire fraud claim where it alleged "material misrepresentations . . . transmitted over the internet," and "the approximate time and the context of" the relevant statements); *1567 56th St., LLC v. Spitzer*, 774 F. Supp. 3d 476, 493 (E.D.N.Y. 2025) (same where complaint alleged existence of

---

[8] Neither Chaitchik nor Teltch authored this communication, but each is alleged to have "caused" it. *See De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 308 (S.D.N.Y. 2013) (citing *Pereira v. United States*, 347 U.S. 1, 8 (1954)).

scheme, its aim of depriving plaintiffs of property, and "the senders, recipients, date, and purported content of the fraudulent transmission"); *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 308 (S.D.N.Y. 2013) (similar).

### 3.    Pattern of Racketeering Activity

The defendants next argue that the AC does not plead a "pattern of racketeering activity." 18 U.S.C. § 1962(c). "For such a pattern to exist, the acts of racketeering activity 'must be related and continuous.'" *Kalimantano*, 939 F. Supp. 2d at 406 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 239 (1989)). "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. "A complaint that properly alleges either a closed- or open-ended pattern satisfies the continuity requirement of the pattern element." *Kalimantano*, 939 F. Supp. 2d at 406. Salient here, close-ended continuity requires plaintiffs to prove "a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. "The relevant period, moreover, is the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place." *Spool*, 520 F.3d at 184.

The AC adequately alleges a close-ended pattern of racketeering activity. In analyzing this issue, courts inquire whether the acts took place over a "substantial period of time." *See Cofacredit, S.A.*, 187 F.3d at 242 (quoting *H.J. Inc.*, 492 U.S. at 242); *see also First Cap. Asset Mgmt., Inc. v. Brickelbush, Inc.*, 150 F. Supp. 2d 624, 634 (S.D.N.Y. 2001) ("[C]ourts have pointed repeatedly to duration as the most important factor in whether a closed-ended RICO pattern exists."), *aff'd sub nom. First Cap. Asset Mgmt. v. Satinwood, Inc.,* 385 F.3d 159 (2d Cir. 2004). The AC plausibly alleges that defendants made misrepresentations to investors and lenders spanning 2015 to 2021. During that span, they transmitted the investment brief, loan

provisions, and false financial statements to plaintiffs and others. The AC also plausibly alleges that, in 2023 and 2024, defendants caused false statements to be made in the Bankruptcy Proceedings. The AC thus plausibly alleges—depending on the enterprise—qualifying predicate acts spanning six or nine years. Either satisfies the close-ended continuity requirement. *See, e.g.*, *Dorfman*, 306 F. Supp. 3d at 573 (finding approximately six years sufficient); *Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir. 1989) (same); *Marini v. Adamo*, 812 F. Supp. 2d 243, 262–63 (E.D.N.Y. 2011) (same); *Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 282 F. App'x 94, 99 (2d Cir. 2008) (summary order) (approximately three-and-a-half years).

Courts assessing close-ended continuity also consider (1) "the number and variety of predicate acts" and (2) the "numbers of participants and victims." *See Spool*, 520 F.3d at 184. Although these factors are not decisive here, they are consistent with a finding of close-ended continuity. Among the wide-ranging predicate acts alleged in the AC, the Court has found at least two plausibly pled: the mail and wire fraud and NSPA schemes. Although each sounds in fraud or theft, the schemes are based on conduct that, although overlapping, is not coterminous (*e.g.*, the alleged misrepresentations in the Bankruptcy Proceedings are relevant to mail and wire fraud, but not to the NSPA violation). As to personnel, the AC does not allege a particularly "complex, multi-faceted conspiracy," *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 468 (2d Cir. 1995) (citation omitted), but multiple actors besides defendants were allegedly involved in the schemes, including Levy (Great Feats' escrow agent), Unger (Chaitchik's father-in-law), and Jacob (Holdings' chief restructuring officer). And the AC alleges a large number of victims of the fraud: approximately 50 other investors or lenders, whom it names. *See* AC ¶ 81.

Because the assembled factors support a finding of close-ended continuity, the AC adequately pleads a pattern of racketeering activity.[9] *See, e.g.*, *Dorfman*, 306 F. Supp. 3d at 573 (close-ended continuity adequately alleged where two defendants "worked in tandem to defraud more than twenty victims over six years to the tune of more than $9 million"); *Marini*, 812 F. Supp. 2d at 262–65 (same where four defendants carried out six-year fraud resulting in plaintiffs' loss of approximately $14.5 million, and "other victims were targeted by defendants' schemes"); *Schackner*, 397 F. Supp. 2d at 404 (same where three named defendants carried out five-year scheme, which involved various fraudulent transmissions and unauthorized transfers).

### 4.    Proximate Causation

"A RICO plaintiff 'only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation.'" *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).  A RICO plaintiff must therefore demonstrate: "(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003) (per curiam) (quoting *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990)).  It is not enough to show "factual causation (*e.g.*, 'cause-in-fact' or 'but for' causation)." *Hecht*, 897 F.2d at 23. Rather, a plaintiff must demonstrate that "the RICO pattern or acts . . . *proximately* cause[d] a plaintiff's injury," meaning they were "a substantial factor in the sequence of responsible causation, and . . . the injury [was] reasonably foreseeable or anticipated as a natural

---

[9] Defendants rely on *First Capital Asset Management, Inc. v. Brickelbush, Inc*, which held that a complaint did not plead open-ended continuity—requiring a threat of continuing racketeering activity—because the alleged scheme was "inherently terminable." MTD at 21 (quoting 150 F. Supp. 2d at 634).  That case, and pleading requirement, are inapposite, as the AC does not allege open-ended continuity.

consequence." *Id.* at 23–24 (emphasis in original). "[A]s a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *First Nationwide Bank*, 27 F.3d at 768.

Defending the AC, plaintiffs identify multiple "causal chains" between the predicate acts and their injuries. Opp'n at 21 n.9. Had defendants "not misappropriated funds from the Project," the Property "would have sold for a higher price in the Bankruptcy Proceedings" and more money would have gone to creditors, including plaintiffs. *Id.* Had defendants not made, or caused to be made, false statements in the Bankruptcy Proceedings, plaintiffs would have filed timely claims and "earned a 50%–70% recovery," as "similarly situated creditors who filed timely claims received." *Id.* at 21. Had Ray NY been treated as an insider during the Bankruptcy Proceedings, more funds would have been available to creditors. *Id.* at 21 n.9.

The Court finds two injuries plausibly pled as proximately caused by the racketeering activity.[10] First, the mail and wire fraud and NSPA offenses proximately caused plaintiffs to lose their investments or loans to the Project. The AC alleges that plaintiffs loaned money based partly on the false promises that their contributions would be held by Great Feats and its escrow agent and would go to the Project. When, contrary to these promises, plaintiffs' money was diverted to unaffiliated persons and plaintiffs' loans went unrepaid, plaintiffs lost money. *See, e.g.*, *Henkind v. Brauser*, No. 87 Civ. 4072, 1989 WL 54109, at *6 (S.D.N.Y. May 17, 1989) (RICO complaint with fraud predicates adequately pled injury based on plaintiffs' reliance on

---

[10] The Court also finds the amount of damages "clear and definite." *First Nationwide Bank*, 27 F.3d at 768. RICO claims "arising out of fraudulently induced loans" are "not ripe for adjudication" until "it is finally determined whether the collateral is insufficient to make the plaintiff whole, and if so, by how much." *Motorola Credit Corp.*, 322 F.3d at 135 (quoting *id.* at 767–68). Here, however, the Bankruptcy Proceedings concluded in 2024, leaving plaintiffs without further recourse, Opp'n at 26–27, such that their claims are ripe.

misrepresentations in purchasing investment interests).  Plaintiffs have thus pled an injury to the extent they loaned and lost money based on false representations and pretenses.[11]

Second, plaintiffs plausibly plead that defendants' misrepresentations in the Bankruptcy Proceeding—for example, omitting Sade as a creditor, and giving a wrong address for Alony— led Alony to file a late claim and Sade not to file a claim at all.  The AC alleges that, whereas two creditors who brought timely claims recovered approximately 50% and 69%, Alony and IRHA (another late filer) received approximately .05% and .04%, respectively.  AC ¶ 157. Defendants' fraudulent statements and the consequent lack of notice to plaintiffs of their right to pursue bankruptcy claims are plausibly alleged to have deprived them of a substantial monetary recovery.[12]

The Second Circuit's decision in *Alix v. McKinsey & Co., Inc.*, 23 F.4th 196, 201 (2d Cir. 2022), supports this theory of proximate causation.  The parties there—Alix, the founder of AlixPartners, and McKinsey & Co, Inc. ("McKinsey")—were competitors in the bankruptcy advising market.  *Id.* at 199.  Alix alleged that McKinsey had submitted false statements in 13

---

[11] To the extent, however, that Alony's claimed $5.75 million injury and Sade's claimed $1.5 million injury embed not principal but the "interest owed to them on account of their loans to the Project," AC ¶ 115, those sums are not recoverable.  RICO plaintiffs alleging fraud predicates can recover their out-of-pocket investments, but generally cannot recover the benefit of their bargain.  Such losses are recoverable in a contract action but not in a fraud action.  *See, e.g.*, *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 311 (S.D.N.Y. 2010) (benefit-of-the-bargain damages non-cognizable because "defendants' misrepresentations induced plaintiffs to invest, but did not cause plaintiffs to lose the supposed benefits of the fraudulent investments").

[12] The AC cites Levy's October 2023 communication as also misleading plaintiffs.  That too is fairly pled as causing injury.  Defendants argue that Levy's alleged communication shows plaintiffs received "actual notice of their ability to file claims in the bankruptcy proceedings." Reply at 2–3 n.2.  But, as alleged, Levy's letter falsely stated that Great Feats would not be entitled to any payment under the bankruptcy plan and that plaintiffs had no chance of success in opposing the proposed settlement.  AC ¶ 198.  Levy's dissembling is plausibly pled to have deterred plaintiffs from timely pursuing relief in the Bankruptcy Proceedings.

bankruptcy proceedings in which it was appointed advisor, and that, had McKinsey filed compliant disclosure statements, it would have been disqualified from certain assignments, at least some of which would have gone to Alix. *Id.* at 201. The Second Circuit overturned the district court's holding that Alix had not alleged proximate causation, citing a "congruence of . . . concerns," *id.* at 207, also at play here. First, it noted that "McKinsey's alleged misconduct targeted the federal judiciary," *id.* at 204; the same is true of defendants' false or incomplete disclosures in the Bankruptcy Court. Second, it found it reasonable to infer that, had McKinsey been disqualified from cases where it filed noncompliant disclosures, the bankruptcy court "would likely have awarded assignments to eligible firms in approximately the same ratio they had been using in the past," *id.* at 205; here, the analogous inference is plausible, that had plaintiffs received proper notice and filed timely claims, their recoveries would have tracked those of timely filers. Third, the Circuit found Alix properly situated to pursue such claims, as the bankruptcy court was not apt to launch "a belated investigation . . . into an already-closed matter" and neither that court nor the U.S. trustee "would be in a superior position to find out what McKinsey did (or did not do)." *Id.* at 208. Likewise here, defendants have not identified "more directly injured victims . . . better suited" than plaintiffs to challenge defendants' conduct in the Bankruptcy Proceedings. *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 141 (2d Cir. 2018).

Defendants attack both theories of injury. [13] They argue that the first—based on their misrepresentations about plaintiffs' contributions to the Project—is "derivative" of the injury to

---

[13] The Court does not rely on the AC's separate theory of injury based on defendants' failure to disclose their connection to Ray NY. Plaintiffs acknowledge that defendants informed the Bankruptcy Court of that relationship after it was identified during a meeting of creditors on September 8, 2023, about one month after the Bankruptcy Proceedings commenced. AC ¶ 67.

Holdings, such that plaintiffs lack standing to claim it. MTD at 23. That is wrong. The Second Circuit has permitted investors and lenders to recover where they alleged a direct injury flowing from a defendant's predicate acts. *See Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988); *see also Manson v. Stacescu*, 11 F.3d 1127, 1130 (2d Cir. 1993). Here, the AC alleges that defendants specifically targeted plaintiffs (and other creditors) with their misrepresentations during the fundraising process, and deliberately omitted plaintiffs from bankruptcy schedules during the Bankruptcy Proceedings. AC ¶ 117. It thus plausibly pleads a direct injury to plaintiffs. *See, e.g.*, *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 105 (D. Conn. 1994) (investors injured directly where they claimed defendants' fraudulent conduct "induced them to purchase their limited partnership interests" and "this result was reasonably foreseeable to the defendants").

As to the second theory—based on defendants' misrepresentations in the Bankruptcy Proceedings—defendants argue that the claimed injuries are "speculative." Reply at 3. They argue that *Alix* is inapposite because plaintiffs "do not allege misconduct that 'targeted' the judiciary" and because there is no guarantee that plaintiffs would have achieved the 50–70% recovery attained by timely investors. *Id.* at 3 n.3. In fact, the false statements defendants are alleged to have made in Bankruptcy Court filings closely resemble those in *Alix* and likewise implicate "the integrity of bankruptcy processes." *Alix*, 23 F.4th at 207. And although plaintiffs' damages are necessarily uncertain, uncertainty as to the damages calculation "should not be confused with proximate cause because they are distinct concepts." *Id.* ("certainty as to the amount of damages is not required at the pleading stage").

The Court therefore holds that the AC plausibly alleges the predicate acts caused injuries to plaintiffs. As a result of defendants' fraudulent conduct, it alleges, plaintiffs lost money they

had invested and loaned and were denied the recoveries they would have achieved in the Bankruptcy Proceedings. Because proximate cause is adequately pled, plaintiffs may pursue their RICO claims. *See, e.g., Baisch*, 346 F.3d at 373–74 (plaintiff had standing to bring RICO claim where he "sufficiently alleged that the defendants' racketeering pattern of mail fraud proximately caused his injury"); *De Sole*, 974 F. Supp. 2d at 310 n.15 (same where plaintiff's alleged injury was a "foreseeable and natural consequence" of defendant's fraud (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008))); *4 K & D Corp.*, 2 F. Supp. 3d at 542–43 (same where plaintiffs were "direct victims of the alleged fraud and have alleged direct injuries for which the defendants' alleged violations of § 1962(c) were the proximate cause").

### 5. Conspiracy

A RICO conspiracy claim must "allege facts implying an[] agreement involving each of the defendants to commit at least two predicate acts." *Hecht*, 897 F.2d at 25. The pleading of conspiracy is "measured under the standards of [Rule] 8(a)," and a defendant's agreement can "be inferred from circumstantial evidence of the defendant's status in the enterprise or knowledge of the wrongdoing." *First Interregional Advisors Corp. v. Wolff*, 956 F. Supp. 480, 488 (S.D.N.Y. 1997).

Defendants argue that, because the AC's substantive RICO claims are defective, its conspiracy claims should likewise be dismissed. Reply at 9. That argument fails because the Court has sustained the substantive RICO claims. *See, e.g., McNulty*, 640 F. Supp. 2d at 321 ("As the majority of [plaintiff's] RICO claims are sufficiently pled, defendants' contention that [plaintiff's] conspiracy claims must fail for lack of an adequately pled substantive violation is meritless."); *Dorfman*, 306 F. Supp. 3d at 573 n.10 ("Since, for the reasons stated above,

33

[p]laintiff's complaint states a claim under RICO, [p]laintiff's RICO conspiracy claim survives [d]efendants' motion to dismiss."). And the AC's factual allegations make plausible the inference that defendants agreed to commit at least two predicate acts. These include that the defendants shared leadership of Holdings and the affiliated entities, coordinated in making false statements to investors and lenders, and that Teltch authorized money transfers to Chaitchik. *See, e.g., N.Y. Dist. Council of Carpenters Pension Fund v. Forde*, 939 F. Supp. 2d 268, 282–83 (S.D.N.Y. 2013) (RICO conspiracy plausibly alleged where defendants had knowledge of ongoing racketeering activities and assisted one another in furtherance thereof); *Palazzolo*, 346 F. Supp. 3d at 463–65 (same based on defendants' positions in enterprise and financial benefits they derived from scheme); *De Sole*, 974 F. Supp. 2d at 311 (same based on "nature of [defendants'] positions in the alleged racketeering enterprise" and facilitation of the conspiracy).

The Court therefore sustains the AC's RICO claims—substantive and conspiracy.

## B.    Aiding and Abetting Breach of Fiduciary Duty

Under New York law, "[a] claim for aiding and abetting a breach of fiduciary duty requires (1) 'a breach by a fiduciary of obligations to another, of which the aider and abettor had actual knowledge,' (2) 'that the defendant knowingly induced or participated in the breach,' and (3) 'that plaintiff suffered damage as a result of the breach.'" *Nielsen Co. (US), LLC v. Success Sys., Inc.*, No. 11 Civ. 2939, 2013 WL 1197857, at *9 (S.D.N.Y. Mar. 19, 2013) (quoting *In re Sharp Int'l Corp.*, 403 F.3d 43, 49–50 (2d Cir. 2005)). For alleged aider and abettors to "knowingly participate[] in a breach of fiduciary duty," they must "provide[] 'substantial assistance' to the primary violator." *In re Sharp Int'l Corp.*, 403 F.3d at 50 (quoting *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 170 (N.Y. App. Div. 2003)). Substantial assistance requires that the aider and abettors "affirmatively assist[ed], help[ed] conceal or fail[ed] to act when required to do so, thereby enabling the breach to occur." *Id.*

34

The AC adequately alleges each of these elements.

As to the first element, it alleges that fiduciaries owed a duty to plaintiffs, which they breached, and that defendants knew of such breaches. It alleges that plaintiffs were owed a fiduciary duty by Salamander, the director of Great Feats; Golden Drache, Great Feats' manager; and Levy, the escrow agent. AC ¶¶ 186–87. Salamander, as an officer of Great Feats, initially owed plaintiffs such a duty in their capacity as shareholders or profit interest equity holders.[14] *See Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 568 (1984) (directors "have an obligation to all shareholders to adhere to fiduciary standards of conduct"). After Great Feats' liquidation, Salamander owed a fiduciary duty to plaintiffs in their capacity as creditors of Great Feats. *See RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184, 202 (S.D.N.Y. 2009) (fiduciary duties of directors extend to creditors only when the corporation is insolvent) (collecting cases), *aff'd sub nom. RSL Commc'ns PLC, ex rel. Jervis v. Fisher*, 412 F. App'x 337 (2d Cir. 2011). Golden Drache owed plaintiffs a fiduciary duty pursuant to the Great Feats loan provisions, which stated that "any disposition of the loan amounts directed by the manager would be beneficial for all parties to the transaction, including the lenders and Great Feats." AC ¶ 34. Levy similarly owed plaintiffs a fiduciary duty pursuant to the Great Feats loan provisions, which stated that, as escrow agent, he would hold plaintiffs' loans "for the benefit of the lenders," *id. See Ray Legal Consulting Grp. v. DiJoseph*, 37 F. Supp. 3d 704, 728 (S.D.N.Y. 2014) ("an escrow agreement creates a fiduciary relationship" and "[a]n escrow agent . . . has a strict obligation to protect the rights of [the] parties for whom he or she acts as escrowee" (quoting *Greenapple v. Capital One, N.A.*, 92 A.D.3d 548, 549 (1st Dep't 2012))).

---

[14] Alony made a $10,000 equity investment in Great Feats, AC ¶ 35, and Sade's loan agreement guaranteed him participation payments from Great Feats' profits, "a form of equity," *id.* ¶ 36.

The AC also alleges that the fiduciaries breached their duties by failing to inform plaintiffs that their funds were not, in fact, going to the Project or being held by Levy, and giving plaintiffs annual financial statements which falsely depicted Great Feats' financial situation. *Id.* ¶¶ 193–95. It further alleges that the fiduciaries breached their duties by failing to file any proof of claim in the Bankruptcy Proceedings and by liquidating Great Feats without repaying its creditors and shareholders. *Id.* ¶ 200. As to Levy, it alleges that he breached his duties in the Bankruptcy Proceedings by falsely informing plaintiffs that Great Feats would not be entitled to any payment under the bankruptcy plan and that there was no possibility of their opposing the proposed debt settlement in that plan; requesting that plaintiffs give Levy power of attorney to act on their behalf in the proceedings; and failing to tell plaintiffs of their rights to file claims and the deadline by which to do so. *Id.* ¶¶ 198–99.

The AC also alleges that defendants had actual knowledge of these breaches because they either directed them or, as for Teltch, because he was the sole individual director of Golden Drache. *Id.* ¶ 202. For example, the AC alleges that Chaitchik solicited financing for the Project through Great Feats and that Teltch directed Levy to transmit the Great Feats loan provisions and withhold notices from plaintiffs about their rights to file claims in the Bankruptcy Proceedings. These allegations support a "strong inference of actual knowledge." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007) (citation omitted).

The AC thus adequately pleads the first element of an aiding and abetting claim.

As to the second element, the AC adequately alleges defendants' knowing participation in the breach. As noted, the AC plausibly alleges that defendants directed the transmission of false statements during fundraising for the Project and during the Bankruptcy Proceedings. On

these allegations, defendant not only affirmatively assisted, but orchestrated and directed, the underlying breaches.

As to the third element, the AC alleges that defendants' participation in the breach proximately caused the plaintiffs' injuries. The causation analysis for this claim closely tracks that for the RICO claims. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 446 F. Supp. 2d 163, 201 (S.D.N.Y. 2006) ("[A]ider and abettor liability requires the injury to be a direct or reasonably foreseeable result of the conduct."). As a result, the Court holds, the AC plausibly alleges that defendants' various misrepresentations resulted in plaintiffs suffering injuries in the amounts of their loans/investments and potential recoveries from the Bankruptcy Proceedings.

Because the AC plausibly alleges each element, plaintiffs' claim for aiding and abetting a breach of fiduciary duty is adequately pled. *See, e.g.*, *In re Platinum-Beechwood Litig.*, 426 F. Supp. 3d 14, 19–20 (S.D.N.Y. 2019) (aiding and abetting breach of fiduciary duty plausibly pled where complaint alleged "a detailed account" of the breach and "facts giving rise to a strong inference that [defendant] had actual knowledge"); *In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 182–83 (S.D.N.Y. 2014) (same where allegations were "sufficient to demonstrate substantial assistance" and "either knowledge or conscious avoidance"), *aff'd sub nom. In re MF Glob. Holdings Ltd. Inv. Litig.*, 611 F. App'x 34 (2d Cir. 2015).

37

**CONCLUSION**

For the reasons stated above, the Court denies the motion to dismiss. The Clerk of Court is respectfully directed to terminate the motions pending at dockets 27 and 43.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: December 11, 2025
           New York, New York